UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION


RICHARD MUSTO,

                Plaintiff,

vs.                                   Case No.  2:07-cv-231-FtM-29DNF

TRINITY FOOD SERVICES, INC., MIKE
HENNESSY, SALVATORE ZAMBO, ANGELO
DI LEO, YVONNE BLUE, ANNA
CABRERA, LEE COUNTY SHERIFF
OFFICERS JUSTIN ROGERS, JARED
ROGERS, LEONARD KRUKOWSKI, RYAN
POLKEMBA, DONALD OVERBEE, DATHAN
PYLE, MARK RESENDES, J. SMITH,
ALAN WELCH, and REVEREND GERRY
CAMP,

                Defendants.
_____


## OPINION AND ORDER

### I. Status

This matter comes before the Court upon review of: (1) the Trinity Defendants' Motion for Summary Judgment (Doc. #98, "Trinity Motion") filed on behalf of Defendants Compass Group USA d/b/a/ Trinity Services Group, Inc., Michael Hennessy, Salvatore Zumbo, Angelo Di Leo, Yvonne Blue, and Ana Cabrera (collectively referred to as the "Trinity Defendants"); and, the Lee County Sheriff Office's Motion for Summary Judgment (Doc. #103, "LCSO Motion") filed on behalf of Defendants Justin Rogers, Jared Rogers, Leonard Krukowski, Ryan Poklemba, Donald Oversee, Dathan Pyle, Mark Resendes, FNU Smith, Alan Welch, Reverend Gerry Camp, and Ryan

Dekeyeser[1] (collectively referred to as the "LCSO Defendants").

Defendant Trinity submits a "Statement of Undisputed Facts Supporting the Trinity Defendants' Motion for Summary Judgment" (Doc. #99).  Both the Trinity Motion and the LCSO Motion attach numerous exhibits in support of their respective Motions.  See generally Trinity Motion, Exhs. A-E, which include, inter alia, the Affidavits of Michael Hennessy and Sandra Sternal (Docs. #99-1 through #99-8); LCSO Motion, Exhs. A-F, and Affidavits of Dathan Pyle, Edward Leavens, Jared Rogers, and Gerry Camp (Docs. #103-1 through #103-12).

The Court advised Plaintiff of the provisions of Federal Rule of Civil Procedure 56 so he could prepare a response to the summary judgment motions.  See February 13, 2007 Order (Doc. # 13) and November 9, 2010 Order (Doc. #101).  Plaintiff filed a response to the Trinity and the LCSO Motions (Doc. #104, "Response") and attached supporting exhibits (Doc. #104-1).  Separately, Plaintiff submitted the "Sworn Affidavit of Mario Bustanmante" in support of his Response (Doc. #105, "Bustanmante Affidavit").  After requesting and obtaining leave of Court (Doc. #108), the Trinity Defendants filed a reply to Plaintiff's Response (Doc. #110), and attached the "Second Affidavit of Michael Hennessy" in support (Doc. #110-1).  This matter is now ripe for review.

---

[1]The LCSO Motion is filed on behalf of Ryan Dekeyeser, but the Complaint does not identify either a "Ryan" or "Dekeyeser" as a named defendant.  See generally Complaint.

## II. Background

Pending before the Court is Plaintiff Richard Musto's ("Plaintiff" or "Musto") *pro se* civil rights complaint (Doc. #6, Complaint) filed pursuant to 42 U.S.C. § 1983, the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* The Complaint attaches 91 pages of exhibits, including, *inter alia*, inmate request forms, inmate grievance forms, inmate complaints, and various handwritten notes (Docs. #6-1, #6-2, and #6-3). Liberally construed, the Complaint alleges First, Eighth and Fourteenth Amendment violations stemming from the denial of nutritionally adequate kosher meals, denial of fasting practices and rabbinical visits, and retaliation due to Plaintiff filing grievances concerning his alleged inadequate kosher meals while Plaintiff was a confined in the Lee County Jail from December 18, 2006 through May 2, 2007. See generally Complaint.[2]

According to the Complaint, Musto is of Hebrew descent and is observant of Jewish dietary practices. Id. at 10. Musto requested and was approved as "a kosher participant" by Chaplain Camp. Id. Musto states that "only days into the program," the kosher meals he

_____

[2] The page numbers referenced herein are to the page of the identified document as it appears on the Court's case management electronic computer filing system. In certain cases, the Court may cite to the docket number of a pleading, as opposed to the title of the pleading. Plaintiff is no longer confined in the Lee County Jail but remains incarcerated in Hamilton Correctional Institution. See Notice of Change of Address (Doc. #74).

was served were inadequate because they did not include "bread and desserts" and did not meet the "F.D.A. recommended daily calories allowances [of] 2000-2500." Id.  Additionally the kosher meals were "tainted" because "the heating facilities in which the meals are heated are un-kosher." Id. at 11.  Musto also claims that the cups used for beverages were "un-kosher." Id.  "After weeks of violations," Musto requested a "vegan diet so as not to violate kosher dietary practices." Id.

Musto also complains that he was "denied fasting practices" by the chaplain, "the chaplaincy ha[d] no religious materials [sic] Jewish, Torah, etc.," and, after being moved from "CPU," he was "denied any further visits by rabbi." Id.  Musto further avers that he was retaliated against due to him "exercising the complaint process." Id.  In particular, Musto states that he was subjected to verbal insults and was falsely disciplined by being placed "into a suicide watch cell." Id.

The Complaint sets forth the following factual allegations as to each of the identified Defendants:

Mike Hennessy

Mr. Hennessy is the Supervisor of Trinity Food Services and denied Plaintiff bread or dessert to complete Plaintiff's meals, as well as milk, jelly products, and fruit. Id. at 12.  Hennessy only permitted Plaintiff to have "the kosher prepared catered trays purchased from North Miami Beach." Id.  Hennessy also "informed"

other Trinity employees that Plaintiff was only permitted the
"catered tray." <u>Id.</u>  Plaintiff states that the meals he was
provided "violated kosher dietary practices" and did not meet "the
daily recommended allowance of calories." <u>Id.</u>

<u>Salvatore Zambo</u>

Mr. Zambo also denied Plaintiff nutritionally adequate kosher
meals.  <u>Id.</u>  Mr. Zambo told Plaintiff's that his meals were
"costly" between "$5.00-$7.00 . . . a tray." <u>Id.</u>  Compared to
other inmates' meals, which cost "$3.50 tops" per day, Plaintiff's
meals cost between "$18.00-$20.00 a day." <u>Id.</u>  Zambo told Plaintiff
"You Jews think you can get anything you want." <u>Id.</u>

<u>Angel</u> (Angelo Di Leo)

Plaintiff alleges that Angel made "antisemitic slurs as if to
be comical," but then would threaten Plaintiff that he would be
"written up" or "ejected from CPU unit" if he caught Plaintiff with
an unauthorized food item on his tray.  <u>Id.</u> at 13.

<u>Ms. Blue and Ms. Ana</u> (Yvonne Blue and Ana Cabrera)

According to the Complaint, both Ms. Blue and Ms. Cabrera
denied Plaintiff bread and dessert, and otherwise ignored his
requests for a kosher substitute.  <u>Id.</u>

<u>Deputy Rogers and Sergeant Krukowski</u>

Deputy Rogers, who was assigned to the CPU Unit, got into a
"disagreement over a couple of pieces of bread" with Plaintiff, and
told Plaintiff "I think you are a scumbag Jew, and I am going to

get rid of you one way or another." _Id._ ay 13-14.  Rogers made
comments daily to Plaintiff, such as:  "Your [sic] still here Jew
boy.  Let's see how long that lasts!" _Id._ at 14.

On January 14, 2007, Sergeant Krukowski "ejected Plaintiff
from life-skills for writing a letter in the bunk area after 8:00
p.m." _Id._  Plaintiff claims that his ejection from life-skills
"was for Deputy Rogers delight."  Additionally, Plaintiff received
a disciplinary report, and was threatened with a "taser gun and
gas." _Id._  Plaintiff "lost" his commissary items. _Id._

### J. Rogers

After Plaintiff was transferred from the CPU unit, J. Rogers,
"the older brother of Rogers in the CPU," "started to pick up after
his brother's doings." _Id._  Plaintiff claims that his grievances
regarding any of the incidents involving J. Rogers were not being
reported so he kept the last page to prove that he was filing
grievances. _Id._

### Polkemba

When Plaintiff filed a request to receive "indigent copying"
to file his "civil rights claim," Deputy Polkemba told Plaintiff
"not to file again." _Id._ at 15.  Deputy Polkemba told Plaintiff
that Plaintiff thought he "was a jailhouse lawyer."  Deputy
Polkemba also called Plaintiff "a little smart Jew bastard." _Id._

<u>Oversee, Pyle, J. Rogers and Welch</u>

Plaintiff states that the above-named Defendants who are deputies at the Lee County Jail "retaliated" against Plaintiff and "abused" him.  <u>Id.</u>  Plaintiff states that these deputies made "false claims" that Plaintiff threatened to hurt himself and commit suicide.  <u>Id.</u>  The deputies attempted to get the inmates to confirm the facts in writing after taking television away from the inmates. On February 28, 2002, Plaintiff claims that "this finally did happen . . . but Mrs. Wheeler and the doctor returned [Plaintiff] . . . after this was explained."  <u>Id.</u> at 16.

<u>Resendes and Smith</u>

Plaintiff alleges that Deputies Resendes and Smith held back his food and legal books.  Deputy Resendes also called Plaintiff "a little piece of shit," "a Jew bastard," and "a little faggart [sic]."  <u>Id.</u>

<u>Reverend Camp</u>

Plaintiff acknowledges that Reverend Camp approved Plaintiff for a "kosher diet," but claims he "declined" his "fasting observations and proper assistance in securing [Plaintiff's] meals before and after sunrise and sunsets according to religious laws and rights."  <u>Id.</u> 16-17.

Finally, as to all the Lee County Deputies, Plaintiff complains that his grievances and/or requests for copying, or information were routinely ignored.  <u>Id.</u> at 18-19.

Plaintiff filed his Complaint against the Defendants in both their individual and official capacities. <u>Id.</u> at 21.   As relief, Plaintiff sought $1,500,000.00 in compensatory and punitive damages.   <u>Id.</u>

On February 20, 2009, the Court dismissed Plaintiff's "claim under the RLIUPA as to the [LCSO] Defendants in their individual capacities."   Order of Court dated February 20, 2009 (Doc. #79) at 17, ¶2.   Additionally, because Plaintiff had failed to allege any actual physical injury, "Plaintiff's request for damages other than nominal damages [was] STRICKEN."   <u>Id.</u>

### III.   Applicable Law

The Trinity and LCSO Defendants now move for summary judgment and submit that they are entitled to judgment as a matter law.   In pertinent part, Defendants argue that Plaintiff cannot sustain a § 1983 claim based upon the undisputed facts under the First, Eight or Fourteenth Amendments, and his claim under the RLUIPA is without merit.   In the alternative, Defendants contend that they are entitled to qualified immunity on Plaintiff's claims.

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of fact and compels judgment as a matter of law." <u>Swisher International, Inc. v. Schafer</u>, 550 F.3d 1046, 1050 (11th Cir. 2008); Fed. R. Civ. P. 56(c).   An issue is "genuine" if there is sufficient evidence such that a reasonable jury could return a

verdict for either party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party bears the burden of identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004). The standard for creating a genuine dispute of fact requires courts to "make all *reasonable* inferences in favor of the party opposing summary judgment, Chapman v. Al Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)(en banc) (emphasis added), not to make all *possible* inferences in the non-moving party's favor.  "A factual dispute alone is not sufficient to defeat a properly pled motion for summary judgment."  Teblum v. Eckerd Corp. of Fl., Inc., 2:03-cv-495-FTM-33DNF, 2006 WL 288932 *1 (M.D. Fla. Feb. 7, 2006). Instead, "[o]nly factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."  Lofton v. Sec'y Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004).  The moving party bears the burden of demonstrating to the Court that based upon the record no genuine issues of material fact exist that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d at 1260(citing Celotex, 477 U.S. at 323).  Further, "allegations in affidavits must be based on personal knowledge, and not be based, even in

part, 'upon information and belief.'"  Pittman v. Tucker, 213 Fed.
Appx. 867, 870 (11th Cir. 2007)(quoting Pace v. Capobianco, 283
F.3d 1275, 1278 (11th Cir. 2002)).

       To avoid the entry of summary judgment, a party faced with a
properly supported summary judgment motion "bears the burden of
persuasion" and must come forward with extrinsic evidence, i.e.,
affidavits, depositions, answers to interrogatories, and/or
admissions, and "set forth specific facts showing that there is a
genuine issue for trial."  Beard v. Banks, 548 U.S. 521, 529
(2006)(citations omitted); Celotex, 477 U.S. at 322; Hilburn v.
Murata Elec. N. Am., Inc., 181 F.3d 1220, 1225 (11th Cir. 1999).
If there is a conflict in the evidence, the non-moving party's
evidence is to be believed and "all justifiable inferences" must be
drawn in favor of the non-moving party.  Beard, 548 U.S. at 529
(citations omitted); Shotz v. City of Plantation, Fl., 344 F.3d
1161, 1164 (11th Cir. 2003).  The court, however, "must distinguish
between evidence of disputed facts and disputed matters of
professional judgment.  In respect to the latter, [the court's]
inferences must accord deference to the views of prison
authorities."  Beard, 548 U.S. at 530.  "A court need not permit
a case to go to a jury, however, when the inferences that are drawn
from the evidence, and upon which the non-movant relies, are
'implausible.'"  Cuesta v. School Bd. of Miami-Dade County, 285
F.3d 962, 970 (11th Cir. 2002) (citations omitted).  Nor are

conclusory allegations based on subjective beliefs sufficient to create a genuine issue of material fact. <u>Leigh v. Warner Bros., Inc.</u>, 212 F.3d 1210, 1217 (11th Cir. 2000). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling in a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

In the summary judgment context, however, the Court must construe *pro se* pleadings more liberally than those of a party represented by an attorney. <u>Loren v. Sasser</u>, 309 F.3d 1296, 1301 (11th Cir. 2002). Under the Rule of Civil Procedure, exhibits are part of the pleadings "for all purposes." Fed. R. Civ. P. 10(c). When exhibits attached to a pleading contradict or dispute the conclusory allegations set forth in the pleading, the exhibits govern. <u>Griffin Indus., Inc. v. Irvin</u>, 496 F.3d 1189, 1205 (11th Cir. 2007).

### IV. Findings of Fact and Conclusions of Law

### A.    Undisputed Material Facts

The record reveals the following undisputed material facts. Musto was held in the Lee County Jail from December 1, 2006 until August 30, 2007. Camp Aff. (Doc. #103-12, ¶8). Musto was housed

in the "CPU"[3] until January 14, 2007, when he was transferred to the stockade.  Id.  The reason for the transfer is not clear.  On January 14, 2007, Musto was issued a disciplinary report for disobeying orders to stay out of the "bunk area."  Complaint (Doc. #6-1) at 3.  The same day, Defendant Jared Rogers caught "Musto eating in his bunk."  Roger Aff. (Doc. #103-11), ¶7.  Musto "had commissary items in his possession without a receipt to show that he had purchased these items from the commissary" so Rogers, "[p]ursuant to policy, confiscated these items from Mr. Musto."  Id., ¶5; see also Doc. #103-1, Exh. A-5.  According to LCSO policy "no food is allowed to be kept from the mealtime trays."  LCSO Handbook at 25.  The only food allowed in housing areas are "those items of food purchased through the commissary."  Id.  Musto filed a inmate complaint with the jail commander and demanded that the items, or the money for the items, be returned to him.  Doc. #103-1, Exh. A-5.  According to Musto's inmate grievance, the following food items were confiscated from him: regular corn chips, cheese crunch, chocolate chip cookies, donut, honey bun, chex mix bold and zest, poppers original.  Id.  A receipt, dated December 13, 2006,

---

[3]"The Community Programs Unit ("CPU") facility is a programs specific housing area.  It is located at the Ortiz corrections site next to the visitation building." Eligibility for the CPU is based upon an inmate's "charges, disciplinary history and in some cases the sentencing charges."  Lee County Sheriff's Office Corrections Bureau, Inmate Rules and Regulations Handbook, Rev. 11/2009, p. 32 (hereinafter LCSO Handbook).  A copy of the LCSO Handbook is attached to Mr. Hennessy's Affidavit (Doc. #99-7) at Exh. B.

reveals that Musto purchased the following items from the commissary: 6 ounce orange-pineapple creams, peanut butter creams, 13 ounce corn chips, and 1.75 ounce of hot peanuts. Doc. #104-1 at 4. Musto had deposits of $20.00 and $30.00 into his inmate account on January 6, 2007 and January 9, 2007. Id. at 2-3.

The "commissary is a privilege." Id. at 28. Inmates are not permitted to "barter with or re-sell items from the canteen purchases." Id. at 29. Bartering is considered a "major" rule violation. Id. at 7. Because bartering is a security issue, "[i]tems purchased at the commissary must be for personal consumption. Inmates must have a receipt to prove that they purchased the items in their possession. If an inmate can not prove that the items in their possession were purchased by them, these items are confiscated." Leavens Aff. (Doc. #103-10), ¶5. Musto acknowledged that he did not have a receipt for the food items that were confiscated. See Inmate Complaint dated January 14, 2007, Doc. #6-1 at 30.

"Threats of suicide are taken very seriously and it is the policy of the Lee County Jail to closely watch any inmate that has threatened suicide until such time as a doctor can evaluate and clear the inmate for return to general population." Id., ¶6. At 4:00 a.m. on February 28, 2007, Defendant Pyle was told by "other inmates that Richard Musto had told them that he was 'not going to kill myself right now . . . I'll wait until the next shift.'" Pyle

Aff. (Doc. #103-9), ¶4.  Pyle reported the comments allegedly made by Musto, and Musto was placed on suicide watch.  Id., ¶5.

The LCSO accommodates inmates' religious dietary practices by providing inmates with kosher and vegan meals.  Hennessy Aff. (Doc. #103-12), ¶7.  Musto was approved to receive kosher meals on December 22, 2006.  Id.  On December 31, 2006, Musto requested that his kosher diet be changed to a vegan diet.  Id., ¶12.

The Lee County Jail contracts with a private company, Trinity Food Group ("Trinity") to provide food service "in a cost effective manner" for inmates.  Hennessy Aff. (Doc. #99-7, ¶2).  Defendants Zumbo, DiLeo, Blue, Cabrera and Hennessy were employees of Trinity during the relevant time set forth in the Complaint.  Id., ¶3. Trinity does not have "any involvement or input with prescribing inmate diets, designing menus, establishing meal schedules or food service policy."  Id., ¶4.  Instead, "the LCSO establishes the general specifications for the meals that Trinity serves to inmates." Id., ¶5.  For instance, the LSCO does not permit pork or pork products in any meal.  Id.

Inmates who request a religious diet are required to direct their request to the LCSO Chaplain, who, after approval, forwards the approved diet to Trinity.  Id., ¶6.  Trinity prepares three meals a day, seven days a week for all inmates, but, for security purposes, is not permitted to directly serve or distribute the meals it prepares for inmates who are housed outside of the CPU.

-14-

Id., ¶7.  Meals provided to non-CPU inmates are served to inmates
in their cells by inmate trustees.  Id.  Meals provided in the CPU
are provided via a "cafeteria style chow line system."  Id., ¶11.
Inmates, like Musto, who are approved for a restricted diet,
identify themselves to Trinity staff, who supervise the food line,
and, if confirmed that they are to receive a restricted diet, are
provided their food by inmate trustees stationed in the serving
line.  Id., ¶7.

From December 23, 2006 until January 18, 2007, Trinity
prepared Musto's meals in accordance with a kosher diet as
authorized by the LCSO.  Id., ¶13. "The objective of the kosher
diet was to ensure that dairy products were not served in the same
meal as meat, chicken or fish, but recognized that it was not
possible to produce totally kosher meals in a correctional setting
without a separate kosher kitchen."  Id.  Consequently, the meals
prepared and provided to inmates on the kosher diet "consisted of
a variety of prepackaged kosher tv-dinner style meals supplemented
with a fruit, like a banana or orange (based upon availability),
fresh bread, a vitamin fortified beverage (ice tea or lemonade) and
other items that are considered inherently kosher to ensure that
the prisoner plaintiff received adequate nutrition.  Trinity
purchased the prepackaged kosher meals from a certified kosher
purveyor in cases of twelve frozen, pre cooked, individually
packaged plastic containers with saran wrap like seals."  Id., ¶14.

Trinity "prepared the prepackaged kosher meals for the prisoner plaintiff by heating them in a microwave oven and then placing them inside a covered styrofoam tray, which was then wrapped in saran wrap and stored in a thermal cart pending distribution during the specified meal period."  Id., ¶16.  When Musto "reported to the chow line during his confinement in the CPU, the inmate trustees stationed at the serving line retrieved the saran wrapped styrofoam tray containing [Musto's] prepackaged kosher meal from the thermal cart, placed it on a tray without unwrapping it and then added the supplemental items to the prisoner plaintiffs meal tray as he proceeded down the chow line."  Id.

Trinity prepared meals for Musto in accordance with a vegan diet which was as authorized by the LCSO, from January 16, 2007, until Musto was transferred from the Lee County Jail.  Id., ¶15.  "The meals prepared for [Musto] under the Vegan Diet excluded dairy and dairy products, like milk, eggs and cheese, and substituted all meat items with peanut butter, beans or legumes."  Id.  After Musto was transferred from the CPU, his kosher and vegan meals were delivered to him on a cart, except "that the supplemental items included with his meals were placed in a paper bag and stored on the transportation cart" with a label "bearing his name."  Id., ¶17.  On January 2, 2007, during his transition from a kosher to a vegan diet, Musto was served a "medical diet" on time at dinner time.  Doc. #10301, Exh. A-2.

"If consumed as prepared, the kosher diet and vegan diet meals each provided approximately 2,800 to 3,000 calories per day, which exceeded the approximately 2,500 calories per day recommended for a sedentary adult male of average build under the standards established by the National Academy of Sciences - National Research Council ("NAS-NRC"), a private, nonprofit, society of distinguished scholars engaged in scientific and engineering research that advise the federal government on scientific and technical matters.  The recommended daily allowances established by the NAS-NRC serve as the national standard for nutrient recommendations." Sternal Aff. (Doc. #99-8), ¶6.

The LCSO employs Defendant Camp as its Chaplain.  Cap Aff. (Doc. #103-12), ¶1.  The LCSO "does not purchase religious literature for inmates," but "accepts donations of religious literature from religious groups outside the institution[,] which are made available to inmates through the prison library." Id., ¶3, ¶4.  Religious material is "distributed on a first come first served basis." Id.  The LCSO relies on volunteer clergy to conduct religious services.  Id., ¶10.  "[A]t least two (2) services each week . . . are non-denominational." Id.  On December 28, 2006, Rabbi Menachem Greenberg visited with Musto at the Lee County Jail. Doc. #103-4, Exh. D-1.

On January 30, 2007, Plaintiff requested a visit by Rabbi Greenberg. Id., Exh. D-5.  Plaintiff was told that Rabbi Greenberg

agreed to see Musto by video but refused to visit with him in person. Id. "The one-on-one visit was a 1 time visit." Id. On March 7, 2007, Plaintiff again requested a visit with Rabbi Greenberg. Id., Exh. D-6. Prison officials called Rabbi Greenberg on March 8th, 12th, 13th 15th, 19th, and 21st. Id. Rabbi Greenberg called correctional officials back on March 21, 2007, and agreed only to a "video visit." Id. On June 13, 2007, Plaintiff requested a personal visit by Rabbi Greenberg. Id., Exh. D-2, D-7. On June 19, 2007, a correctional officer placed a call to Rabbi Greenberg and left a message. Id. Rabbi Greenberg returned the call the next day, and correctional officials arranged and approved a visit by Rabbi Greenberg for Musto for 9:45 a.m. on June 26, 2007. Id., Exhs. D-3, D-4, D-8, D-9. On July 16, 2007, Musto requested religious material purportedly left by Rabbi Greenberg. Id., Exh. D-12. Correctional officials called Rabbi Greenberg who advised them that he had not "dropped off" the "Torah . . . as he planned to do." Id. On July 18, 2007, Musto asked when Rabbi Greenberg was scheduled to visit next. Id., Exh. D-13. On July 23, 2007, correctional officials left a message for Rabbi Greenberg on behalf of Musto. Id. On July 25, 2007, Rabbi Greenberg returned the call and advised officials that he "will be out of town for a while." Id. Correction officials approved a visit by Rabbi Greenberg for Musto for 2:00 p.m. on August 14, 2007. Id. On August 16, 2007, Musto requested "religious material" left by

Rabbi Greenberg. <u>Id.</u>, Exh. D-15. Plaintiff was advised that Rabbi Greenberg left one book called "Book of Our Heritage," but that the book must be donated to the library and then would be available to any inmate on a "first-come, first-served basis." <u>Id.</u>

Inmate Bustamante[4] overheard Defendants DiLeo and Zambo complain about the cost of the kosher meals and remark to Must that "Jews think they can have anything they want." Bustamante Aff. (Doc. #105), ¶15. Additionally, DiLeo and Zambo warned Musto that he was only permitted to eat "what is on the tray" and if caught with "anything extra" Musto would be "written up [and] removed from kosher." <u>Id.</u>, ¶17. "Occasionally," Bustamante recalls not seeing supplemental food items on Musto's tray. <u>Id.</u>, ¶13.

### B.   Analysis

Title 42 U.S.C. § 1983 imposes liability on one who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." To state a

---

[4]Inmate Bustamante claims he worked as a trustee in the dining hall. Bustamante Aff. (Doc. #105), ¶4. Bustamante claims that no fruit or dessert are provided to the kosher meals, only to the vegan meals. Bustamante states that he "sat at the same table <u>occasionally</u>" with Musto in the CPU and he never saw Musto with "anything but the kosher tray and styrofoam cup." <u>Id.</u>, ¶13 (emphasis added). The Trinity Defendants dispute that Bustamante worked as a food services trustee. Second Hennessy Aff. (Doc. #110-1), ¶4. Records maintained by the LCSO and reviewed by Defendant Hennessey reflect that Bustmante worked as a "GED assistant" from December 6, 2006 through March 4, 2008. <u>Id.</u> The Court accepts Bustamante's Affidavit only to the extent that it is based on what he saw or what he heard. Thus, Bustamante's testimony regarding whether Musto received fruit and bread with his meal is limited to what he saw on "occasion."

claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) defendants deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law. U.S. Steel, LLC v. Tieco, Inc., 261 F.3d 1275, 1288 (11th Cir. 2001); Arrington v. Cobb County, 139 F.3d 865, 872 (11th Cir. 1998). "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266 (1994)(plurality opinion). In the case sub judice, Plaintiff claims violations of his First, Eighth and Fourteenth Amendment rights, as well as violations of the RLIUPA. See generally Complaint. For the reasons set forth below, the Court finds that based upon the record, the Trinity Defendants and LCSO Defendants are entitled to summary judgment as a matter of law.

### 1.  Compensatory and Punitive Damages

Previously, the Court granted Defendant LCSO's motion to dismiss to the extent that the Court struck Plaintiff's claims for compensatory and punitive damages pursuant to 42 U.S.C. § 1997e(e). See February 2, 2009 Order (Doc. #79). The Court reaffirms its prior ruling. The record demonstrates that Plaintiff did not incur any physical injuries as a result of any of the alleged violations. See Plaintiff's Responses to Combined Interrogatories, Requests for Admission, and Request for Production, Doc. #102-2 at 4, ¶5 and at 7, ¶13. Consequently, even if Plaintiff could prevail on any of

his claims, because this action was brought while Plaintiff was prisoner and because Plaintiff has not sustained any physical injury, Plaintiff is not entitled, as a matter of law, to any compensatory or punitive damages.  42 U.S.C. § 1997e(e); <u>Harris v. Garner</u>, 216 F.3d 970, 985 (11th Cir. 2000).

### 2.  First Amendment - Free Exercise of Religion

The First Amendment to the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. Amend. I.[5]  Although, "prisoners do not shed all constitutional rights at the prison gate, . . . [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights."  <u>Sandin v. Conner</u>, 515 U.S. 472, 485 (1995)(citation and quotations omitted).  Despite their incarceration, inmates must be afforded a "reasonable opportunity" to exercise their religious freedom.  <u>Cruz v. Beto</u>, 405 U.S. 319, 322 (1972).  Thus, in order to sustain a First Amendment claim, a prisoner must be able to show that his ability to practice his faith was substantially burdened.  <u>See</u> <u>Turner v. Safley</u>, 482 U.S.

---

[5]The First Amendment's Free Exercise Clause is applicable to the states through the Fourteenth Amendment.  <u>See</u> <u>Cantwell v. Connecticut</u>, 310 U.S. 296, 303 (1940).

78, 85 (1987); <u>Cheffer v. Reno</u>, 55 F.3d 1517, 1522 (11th Cir. 1995). A "substantial burden" is defined as a burden that either compels a person to engage in conduct that is forbidden by his religion, or conduct that prohibits a person from engaging in conduct required by his religion. <u>Cheffner</u> 55 F.3d at 1522.

### a. Dietary Issue

The gravamen of Plaintiff's Complaint concerning his religious diet is that he was denied certain supplemental food items, such as bread and dessert with his kosher meal. Plaintiff attaches to his Complaint a hand-written meal diary of his meals over a seven-day period from December 23-30, 2006. Doc. #6-3 at 14 ("Plaintiff's meal diary"). According to Plaintiff's meal diary, Plaintiff did not receive bread or a dessert at dinner on December 26, 2006, no bread, dessert or beverage at lunch and dinner on December 29, 2006, and no jelly or bread at breakfast on December 30, 2006, and no bread or dessert at lunch or dinner on December 30, 2006. <u>Id.</u> Thus Plaintiff did not receive supplemental meal items in six (6) out of the twenty-one (21) meals he was provided over this time period. Even assuming that Plaintiff can demonstrate that he was denied these supplemental meal items, Plaintiff fails to demonstrate how the denial of these items burdened his ability to practice his faith to sustain a First Amendment violation. In particular, Plaintiff does not show that in order to sustain himself in good health he was required to consume non-kosher food

in violation of his religious tenets.  Plaintiff periodically was
not provided supplemental meal items, which amounts to negligence,
at most.  Isolated acts of negligence do not amount to a violations
of an inmates' First Amendment free exercise rights.  Gallagher v.
Sheldon, 587 F.3d 1063, 1070 (10th Cir. 2009).  Consequently, the
Court finds Plaintiff has failed to demonstrate a First Amendment
violation concerning his dietary meals.

### b.  Religious Material and Services

The Lee County Jail employs Defendant Camp as its Chaplain and
it relies on volunteer clergy to conduct religious its services.
The reliance of jail officials upon volunteer clergy has been found
to be reasonably related to a correctional institution's security
and budgetary concerns and not violative of an inmate's First
Amendment rights.  Hathcock v. Cohen, 287 Fed. Appx. 793, 800 (11th
Cir. 2008)(finding that religious services held every two weeks not
violative of inmates' First Amendment rights, citing Lawson v.
Singletary, 85 F.3d 502, 510 (11th Cir. 1996)).  Further, Plaintiff
does not allege, yet alone demonstrate, how the failure to receive
more frequent visits from a rabbi denied him his First Amendment
rights.  Plaintiff does not explain why he could not pray in his
cell or pray with another inmate of the same faith.  See McCorkle
v. Johnson, 881 F.2d 993, 996 (11th Cir. 1989)(explaining that an
inquiry into other means asks "whether, under the restriction
imposed, the plaintiff is deprived of all means of practicing his

religion."). Additionally, the record evidences that correctional officials contacted the rabbi when Plaintiff requested, and approved the rabbi's visits when the rabbi agreed to visit with Plaintiff. Further, Plaintiff was advised how to obtain access to any religious materials when he requested them.

Finally, with respect to Plaintiff's claim that he was denied fasting privileges, the record reveals only that, on December 28, 2006, Plaintiff advised Defendant Camp that he was required to "fast" on Sunday, December 31, 2006. Doc. #6-3 at 21. Although not clear, it appears that Plaintiff requested his meal to be brought after sundown. On December 29, 2006, Officer Howard responded "We are supplying you with a kosher diet. You can fast anytime you want." Id. Thus, it is unclear how Plaintiff's fast was not honored. Even if Plaintiff's meal was brought before sundown and his fast was somehow disrupted, an isolated incident of negligence or failure to comport exactly with religious tenets does not amount to a First Amendment Free Exercise deprivation. Gallagher v. Sheldon, 587 F.3d at 1070; see also Lovelace v. Lee, F.3d 174, 201 (4th Cir. 2006). Thus, the Court finds that Defendants are entitled to summary judgment on this issue.

### 3. First Amendment - Retaliation

To establish a retaliation claim, the inmate must demonstrate that: "first, his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected

the protected speech; and third, . . . a causal connection between the retaliatory actions and the adverse affect on speech." Douglas v. Yates, 535 F.3d 1316 1321 (11th Cir. 2008)(citing Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005)); Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008). An inmate's constitutionally protected "First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner is punished for filing a grievance concerning the conditions of his imprisonment." Douglas, 535 F. 3d at 1321 (quoting Boxer v. Harris, 437 F.3d 1107, 1112 (11th Cir. 2006)). Thus, an essential element of a First Amendment retaliation claim is the existence of a retaliatory motive. See Gattis v. Brice, 136 F.3d 724, 726 (11th Cir. 1998) ("To succeed in a section 1983 suit based on a claim of retaliation for speech, the plaintiff must show that his speech was a 'substantial' or 'motivating' factor in the allegedly retaliatory decision."). See also Farrow v. West, 320 F.3d 1235, 1240 (11th Cir. 2003). A plaintiff must do more than make "general attacks" upon a defendant's motivations and must articulate "affirmative evidence" of retaliation to prove the requisite motive. Crawford -El v. Britton, 523 U.S. 574, 600 (1998) (citations omitted). Instead, a plaintiff must be able to show that a defendant was "subjectively motivated to discipline" the plaintiff for exercising his First Amendment rights. Smith v. Mosley, 532 F.3d at 1278. Additionally, a plaintiff must show that

he was "penalized for exercising the right of free speech." <u>Brown</u> <u>v. Mache</u>, 233 Fed. Appx. 940, 941 (11th Cir. 2007).  Courts are not to infer causation or construe legal conclusions as facts.  <u>Aldana</u> <u>v. Del Monte Fresh Produce, N.A., Inc.</u>, 416 F.3d 1242 (11th Cir. 2005).  Further, courts should give deference to prison officials when evaluating whether there was  legitimate penological reasons for the alleged retaliatory conduct.  <u>Sandin v. Conner</u>, 515 U.S. 472 (1995).

Plaintiff does not come forward with any evidence to support his allegation that he was disciplined for writing grievances.  To the contrary, Plaintiff acknowledges that on, January 14, 2007, his commissary items were taken "because I had not saved my receipt." Inmate Complaint dated January 14, 2007 (Doc. #6-1) at 30. Further, Plaintiff acknowledged that he was ejected from the CPU because he was "writing a letter in [his] bunk area at 8 p.m." <u>Id.</u> at 5.  Additionally, Deputy Rogers wrote Plaintiff a disciplinary report on January 14, 2007, but Plaintiff did not file any grievances against Defendant Rogers until January 18, 2007, which was <u>after</u> Plaintiff was given the disciplinary report and transferred from the CPU.  <u>See</u> Inmate Complaint dated January 18, 2007 (Doc. #6-1) at 31.  Thus, Rodgers could not have retaliated against Plaintiff for Plaintiff writing a grievance, since Plaintiff did not file any grievances against Rodgers before January 14, 2007.  Nor does Plaintiff offer any evidence to refute

that Defendant Pyle was told by inmates that Plaintiff had made statements about suicide; and, thus had reason to believe that Plaintiff had suicidal ideations.  Plaintiff's bare assertion that he was transferred from CPU or placed on suicide watch in retaliation for writing grievances without any supporting evidence proves fatal to his retaliation claim.  <u>Farrow v. West</u>, 320 F.3d 1248; <u>Fullman v. Graddick</u>, 739 F.2d 553, 557 (11th Cir. 1984). Accordingly, the Court finds that Defendants are entitled to summary judgment on this issue.

### 4. Eighth and Fourteenth Amendments

The Constitution does not require "comfortable prisons" with all the amenities, but it requires that prisons not be "inhumane." <u>Farrow v. West</u>, 320 F.3d 1235, 1242 (11th Cir. 2003)(citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994)).  The Eighth Amendment,[6] which prohibits cruel and unusual punishment, governs the conditions of prison life and the treatment of prisoners.  <u>Farrow</u>, 320 F.3d at 1242-43 (citing <u>Helling v. McKinney</u>, 509 U.S. 25, 31 (1993)).  "[P]rison conditions rise to the level of an Eighth Amendment violation only when they 'involve the wanton and unnecessary infliction of pain.'" <u>Chandler v. Crosby</u>, 379 F.3d

---

[6]Plaintiff's rights as a pretrial detainee derive from the Due Process Clause of the Fourteenth Amendment.  <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 (1979).  Nonetheless, in the context of a claim concerning the conditions of confinement, the standard is the same as an Eighth Amendment claim.  <u>Hamm v. DeKalb County</u>, 774 F.2d 1567, 1571 (11th Cir. 1985); <u>Marsh v. Butler County, Ala.</u>, 268 F.3d 1014, 1024 n.5 (11th Cir. 2001).

1278, 1289 (11th Cir. 2004)(quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981)).  To "make out a claim for an unconstitutional condition of confinement, 'extreme deprivations' are required." Thomas v. Bryant, ___ F.3d ___, No. 09-11658, 2010 WL 3270965 * 9 (11th Cir. Aug. 20, 2010)(citations omitted).

The courts employ a two-part analysis when evaluating an Eighth Amendment challenge to a prisoner's conditions of confinement. <u>Chandler</u>, 379 F.3d at 1289. "First, under the 'objective component,' a prisoner must prove that the condition he complains of is "extreme" and sufficiently serious to violate the Eighth Amendment." <u>Hudson v. McMillian</u>, 503 U.S. 1, 8-9 (1992). Second, the "subjective component" requires prisoners to show that prison officials "acted with a sufficiently culpable state of mind" regarding the condition at issue.  <u>Id.</u> at 8.  The subjective standard is met if officials are deliberately indifferent to providing a prisoner with basic necessities, such as reasonably adequate food, clothing, shelter, and sanitation. <u>Hamm</u>, 774 F.2d at 1572.

### a.  Dietary Issues

Plaintiff claims that the denial of the bread and dessert denied him adequate nutrition in violation of his Eighth Amendment rights.  Here, the objective factors prove fatal to Plaintiff's claim. At most, Plaintiff can demonstrate that he was not satiated after finishing his meals.  By Plaintiff's own admission he had

money deposited into his inmate account with which he could purchase additional items from the canteen. Plaintiff does not allege that he was losing weight. Even assuming *arguedo* that Plaintiff was improperly denied dessert and bread for the short period of time he elected to have the kosher diet, such a deprivation is not a "serious" or "extreme" condition, or one that violates "contemporary standards of decency," or constitute the denial of "the minimal civilized measure of life's necessities." Chandler, 379 F.3d at 1289-90; Farrow, 320 F.3d at 1243; Rhodes, 452 U.S. at 347. Therefore, summary judgment will also be granted on Plaintiff's Fourteenth Amendment claim concerning his inadequate diet.

### b. Verbal Harassment

Musto alleges that various LCSO Defendants made racially derogatory comments to him and threatened to "write him up" or have him removed from the kosher diet if he had anything else on his tray. Notably, Defendants do not refute that such comments were made. Admittedly, racial epithets are repulsive and generally the weapon of the uncivilized. Nonetheless, verbal harassment does not state a claim for relief in a federal civil rights action. See McFadden v. Lucas, 713 F.2d 143, 146 (5th Cir.)("mere threatening language and gestures of a [state actor] do not, even if true, amount to constitutional violations"); Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (10th Cir. 1987)(vulgar language directed at inmate

does not state a constitutional claim); <u>Burton v. Livingston</u>, 791 F.2d 97, 101 n.1 (8th Cir. 1986) (use of racial slurs in prison does not offend Constitution); <u>Keenan v. Hall</u>, 83 F.3d 1083, 1092 (9th Cir. 1996)("disrespecful and assaultive comments" to inmate does not state a claim under the Constitution).

### 5. Religious Land Use and Institutionalized Persons Act

Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability," unless the government can show that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a); <u>see also</u> <u>Smith v. Allen</u>, 502 F.3d 1255, 1266 (11th Cir. 2007)("[S]ection 3 affords confined persons 'greater protection of religious exercise than what the Constitution ... affords' "because the Constitution requires only a showing of a legitimate governmental interest.).

To establish a prima facie case under Section 3, a plaintiff must show: (1) that he engaged in a religious exercise, and (2) that the religious exercise was substantially burdened by a government practice. <u>See</u> <u>id.</u> at 1276. "The plaintiff bears the burden of persuasion on whether the government practice that is challenged by the claim substantially burdens the exercise of

religion." <u>Id.</u> (quotation marks, alteration, and ellipsis omitted). If the plaintiff establishes a *prima facie* case, the government must show that the challenged government practice is "in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." <u>Id.</u> (quoting 42 U.S.C. §§ 2000cc-1(a), 2000cc-2(b)). Context matters in the application of the compelling governmental interest standard. <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 723 (2005). The standard is applied with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." <u>Id.</u>

Here, the Court finds no facts to support a claim under the RLUIPA, and Plaintiff fails to identify what actions by the Trinity Defendants or the LCSO Defendants violated the RLUIPA. To the extent that Plaintiff contends that the Lee County Jail's failure to have his kosher meals prepared in an approved kosher oven violates the RLUIPA, his contention is without merit. <u>See Muhammad v. Sapp</u>, No. 09-14943, 2010 WL 2842756 *3 (11th Cir. July 21, 2010)(denying inmate claim under the RLUIPA in which inmate sought strict adherence to kosher practices finding cost containment and budgetary concerns were compelling governmental interest, and citing with approval, <u>Baranowski v. Hart</u>, 486 F.3d 112, 125-26 (5th

Cir. 2007)(holding budgetary and security concerns were a compelling governmental interest justifying the failure to provide kosher meals to a Jewish inmate)).

Because the Court finds no constitutional violation, the Court need not reach the issue as to whether the Defendants are entitled to qualified immunity.

ACCORDINGLY, it is hereby

**ORDERED**:

1.  Defendants Trinity and LCSO's Motions for Summary Judgment (Docs. #98 and #103) are **GRANTED**.

2.  The Clerk of Court shall terminate any pending motions, enter judgment accordingly, and close this case.

**DONE AND ORDERED** in Fort Myers, Florida, on this ___9th___ day of September, 2010.

_____

**JOHN E. STEELE**
United States District Judge

SA: hmk
Copies: All Parties of Record

-32-